UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERICA CHARBONNEAU,

Plaintiff,

v.

LUXARK, LLC, *et al.*,

Defendants.

______________________________/

Case No. 25-12179

F. Kay Behm
United States District Judge

**OPINION AND ORDER ON DEFENDANTS' MOTION TO DISMISS (ECF No. 13)**

## I. PROCEDURAL HISTORY

Plaintiff, Erica Charbonneau, filed this employment matter against her former employer, LuxArk, LLC and its owner, Austin Boone. (ECF No. 1). Plaintiff filed an Amended Complaint on September 17, 2025. (ECF No. 12). Defendants filed a motion to dismiss the Amended Complaint. (ECF No. 13). Plaintiff filed a response and Defendants filed a reply. (ECF Nos. 14, 15). With the permission of the court, Plaintiff filed a sur-reply. (ECF No. 19). Defendants filed a response to the sur-reply without seeking leave of court and thus, this brief will not be considered. (ECF No. 20). The court held a hearing on April 15, 2026. At the hearing, the court invited the parties to file supplemental briefs, which they did. (ECF Nos. 22, 23). For the reasons set

forth below, Defendants' motion to dismiss the Amended Complaint is **DENIED**.

## II. FACTUAL BACKGROUND

Plaintiff is a 20-year-old female artist residing in Canada, and Boone is the male sole owner and founder of LuxArk, a limited liability company with its principal place of business in Novi, Michigan. (ECF No. 12, ¶¶ 1, 2, 7,8). LuxArk is a staffing agency/art studio that assists in placing entry level artists and designers with game development studios and mentorship programs and offers newer artists a foot in the door in the industry. *Id*. at ¶ 9. Plaintiff was initially hired by Boone to work at LuxArk as an unpaid intern. *Id*. at ¶ 10. In January 2025, Boone promoted Plaintiff to the paid role of administrative assistant where she reported directly to Boone. *Id*. at ¶¶ 11, 12. Plaintiff worked directly for LuxArk as an employee and was also staffed with other businesses through LuxArk to further her art brand. *Id*. at ¶ 13. In the spring of 2025, Boone promoted Plaintiff to Studio Coordinator at LuxArk, where she continued to report directly to Boone. *Id*. at ¶¶ 14, 15.

Boone controlled Plaintiff's work assignments and directed her daily activities through text messages, phone calls, and messages and

video chats on Discord. (ECF No. 12, ¶ 16). Boone paid Plaintiff's hourly wages, and paid her various bonuses. *Id*. at ¶ 17. There were no Human Resources staff or other management employees that Plaintiff could turn to with issues or problems with her employment, aside from her supervisor and the owner, Boone. *Id*. at ¶ 18.

In her role as Studio Coordinator, Boone messaged Plaintiff throughout all hours of the day, and on weekends, regarding work-related matters. (ECF No. 12, ¶ 19). On April 29, 2025, Plaintiff discussed over messages with Boone a $500 bonus payout that she would receive after securing 20 contracts through the year, where Boone replied to Plaintiff, "Finances won't be nothing when you know me… you'll be taken care of… you too fine to pass up," and called her his "baby." *Id*. at ¶ 20. In response, Plaintiff asked over text message that Boone keep the names professional, and indicated in her response that she was not interested in any romantic relationship with Boone and that she had a boyfriend. *Id*. at ¶ 21.

Throughout May 2025, Boone's conduct towards Plaintiff escalated in sexual tone while referencing Plaintiff's role at LuxArk, where he told her over text message that he enjoyed helping her "shape" her dreams, "you know how I feel about you," and that if he seemed confused during a meeting, "it's

because I'm leaning into how this rhythm feels with you lately." (ECF No. 12, ¶ 22). On May 11, 2025, Boone sent a text to Plaintiff, asking for a picture of herself because "I want to keep you in priority for Crown [Crown is a reference to a work project] and next contract without being distracted." Plaintiff asked for clarification, to which Boone requested, "A selfie pic" from her. *Id*. at ¶ 25. Plaintiff refused and told Boone over text that she was not comfortable sending Boone a picture of herself. *Id*. at ¶ 26. On May 21, 2025, Boone texted Plaintiff that he was "looking forward to your soft voice again, how sharp and supporting always are." *Id*. at ¶ 27. On May 23, 2025, Boone texted Plaintiff that he was building this company for her and that he did not want anything more than to see her "blossom into your full state, creative, gentle, but ambitious and driven," and that he was "quite passionate" when he thought of "pouring into you and your world, to support, to fill." *Id*. at ¶ 30. That same day, Plaintiff again put in writing a request to Boone that he keep their conversations professional and requested that he maintain a level of professionalism when they communicated. *Id*. at ¶ 31. Boone acknowledged over text that he crossed the line but continued to use phrases in texts to Plaintiff such as, "I feel you," and "I'll keep our conversations in that frame going forward, slow and steady," "whatever shape it needs to take for you." *Id*.

at ¶ 32. Boone continued to send similar messages to Plaintiff in May including "We'll keep shaping this role around you until it fits just right—beside me. Feels like that's where you were always meant to be. Dont [sic] wander to far ill find you again later."; "But what moved me the most...wasn't the updates. It's that I felt you, everywhere. [...] Like you've wrapped yourself around this place. Around me. So I'll say it plainly now: LuxArk didn't just find a Studio Coordinator. It found the woman it was built for. Queen Erica."; "the way your [sic] stepping through into the role, confident, covering... it's magnetic. And this is just the beginning. [...] Now, the invoices- it's time they have your hands bless them." *Id*. at ¶¶ 34, 35, 37.

On May 29, 2025, Boone also wrote in a text to Plaintiff that his daily status updates about her ongoing work at LuxArk were "just the excuse" to communicate with her, and stated, "I crave you, Erica." (ECF No. 12, ¶ 38). On May 29, 2025, Plaintiff replied in a text to Boone that she wanted to take on more responsibilities with the invoices, but asked Boone to keep the conversation respectful and strictly professional. *Id.* at ¶ 39. Boone replied, "Understood, -respect and clarity noted. But the way you moved tonight. Calm, sharp, unapologetic—it was actually electric. I'd be lying if I said it didn't stay with me. You're stirring something deeper.", and later that day, he

stated, "Now earlier... You didn't just set a boundary. You claimed the space. Claimed me. I've never had that happen—never felt it like that before [...] There's an echo between us. It lingers in the quiet after every message... every update... And its only getting louder. Quieter in tone. Stronger in pull," and, "we both like it." *Id*. at ¶ 40. Plaintiff repeatedly objected and expressed that she did not consent to these messages, and that the inappropriate communications from Boone were unwanted. *Id*. at ¶ 41. While her responses and updates to Boone were strictly related to communication regarding her ongoing job duties, Boone messaged her on May 31, 2025, stating, "You don't even realize how mouthwatering you are. Those luscious soft curls, the curves of your figure to that feminine, commandeering stillness-a Queen," in the same string of messages regarding their ongoing work. *Id*. at ¶ 44.

Boone's inappropriate messages continued throughout June 2025, and Plaintiff continued to object to any unprofessional or non-work-related communications. (ECF No. 12, ¶¶ 47-55); (*See e.g.*, ¶ 52 Boone texted Plaintiff "That's my good girl. That's my Froggy. Come closer when its time. Don't be shy, you're safe in my arms here."). On June 12, 2025, Boone sent Plaintiff the following text at 6:49 a.m.:

> Get up.
> Why don't I see Jonathan and Matilde sessions updated? Handle it first thing—I shouldn't have to pin you down.
>
> And I still haven't seen the Slack announcements for the updates
> I told you to push.
> Do I really need to drag you to it… strand by strand?
>
> Don't tempt me. I run this business… I'll run you too.
> And you know I will.

*Id*. at ¶ 58. Plaintiff perceived this message as a physical threat to her safety. *Id*. at ¶ 59. Plaintiff promptly responded, explaining why the contract had not yet been sent, and that she was planning to post on Slack that morning. *Id*. at ¶ 60. Boone then replied to Plaintiff over text, "That's what I like to see. […] Just don't test me like that again. You know what you're doing. […] And you're not free from the invoices--those pass through your hands. […] You'll be fed again after lunch. Stay close." Boone also stated in the text, "And don't worry, you'll have the invoice links to send. That's how I keep you close." *Id*. at ¶ 61. When Plaintiff did not respond to this message, Boone sent her another message: "Did I ask for silence. When I empty into you, you respond—that's our rhythm. … I didn't tell you to go dark on me. I tend to what's mine. Don't make me drag you back to the surface again—toe by toe, sole by sole…until

your scent floods the air. […] Because what's mine doesn't get to hide. […] You're not just seen. You're Owned. Claimed. Marked. Reeking of belonging. And when I fill you… I expect to feel when I'm done." *Id*. at ¶ 63. Plaintiff alleges that she perceived Boone's message to be a threat of sexual assault based on her lack of response to his messages. *Id*. at 64.

During a phone meeting on June 13, 2025, Plaintiff told Boone that she felt extremely uncomfortable about his sexual harassment and this was no way to speak to an employee. (ECF No. 12, ¶ 70). Later that same day, Boone wrote over text message to Plaintiff: "You were loud and clear—That's what I love about my Froggy. You don't want the man the others get. You want the beast. I know when your 'no' means 'take me.' When your silence is you begging, pleading. When your protests are your gates parting—inviting me in. You want a man? You'll get one. A man. A beast. The rhythm. The reign. Monday—no more behind words. I'll speak you wide open. I'll stretch you in every way you've silently craved." *Id*. at ¶ 71. Plaintiff responded that there was no hidden meaning behind how many times she said "no" and that his continued behavior after she asked him to stop was harassment. *Id*. at ¶ 72.

On June 14, 2025, Boone demanded that certain tasks be done by the end of the day. *Id*. at ¶ 75. When Plaintiff confirmed over text to Boone that

the work tasks were all completed at 7:49 pm on that Saturday night, Boone wrote to her, "Look at you… submissive before the hour even struck. […] When you obey like that… it lights me up. Turns me feral. […] This is the kind of obedience I expect from my Queen—not merely doing the work, but anticipating my presence. Not just execution… but devotion." *Id*. at ¶ 76. On Sunday, June 15, 2025, Boone sent multiple messages to Plaintiff about their "rhythm," his visions of her "climaxing," and Boone referred to her as his beloved, his queen, his bride, and referred to himself as "your priest, your King." *Id*. at ¶ 78. Plaintiff did not respond to these messages. *Id*. at ¶ 79. On Monday, June 16, 2025, Boone sent an instruction to Plaintiff: "Cams on today." meaning that he required her camera on during meetings with him and wrote that she "needed to get used to it" because she was the face of LuxArk and that she "stands beside him now in reporting structure." Boone's message further stated, "No hiding. No Delay. Perform. Impress. Obey. […] And tonight… I'll bend you over the throne and remind you who owns your excellence." *Id*. at ¶ 80. Plaintiff perceived this as another threat of sexual assault. *Id*. at ¶ 81.

On June 17, 2025, Plaintiff submitted her resignation from employment to Boone over text: "I've asked you to stop but it's clear that you are not going

to respect my boundaries. Therefore, I've made the decision to leave LuxArk, effective immediately. Due to continuous sexual harassment, I no longer feel safe or comfortable in this work environment." (ECF No. 12, ¶ 84). Plaintiff alleges that her resignation amounted to a constructive discharge. *Id*. at ¶ 85.

After her resignation, Boone continued to send her messages. For example, he texted her "Get your ass back in the emails. Be at the 11AM session. This isn't optional," and days later, he stated over text, "Don't mistake your silence for power. You are seen. You are spoken for. [...] You are here to serve," and texted her to "crawl back to your throne." *Id*. at ¶ 86. Boone repeatedly texted Plaintiff to get back to her inbox, stating, "You are not free. You will never be free," and began referring to himself in texts to Plaintiff as her "husband" and "daddy," and sent her various voice memos. Plaintiff did not answer. *Id*. at ¶ 87. On June 27, 2025, Boone sent Plaintiff a picture of a belt, with her artwork in the background, stating, "The belt waits. Not for rebellion. For obedience." *Id*. at ¶ 88. On June 27, 2025, Boone continued to send messages to Plaintiff referring to their "rhythm" being restored, their "rhythm smacks again," and continued to try to assign her work projects over text as if she was still an employee. *Id*. at ¶ 90. Plaintiff has not responded to

Boone's post-constructive discharge messages, and contacted the police in Canada, who warned Boone to cease contact with Plaintiff. *Id*. at ¶ 91.

## III. ANALYSIS

### A. Standard of Review

In deciding a motion to dismiss under Rule 12(b)(6), the court "must construe the complaint in the light most favorable to the [nonmoving party] … [and] accept all well-pled factual allegations as true." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007); *see also Yuhasz v. Brush Wellman, Inc*., 341 F.3d 559, 562 (6th Cir. 2003). The complaint must provide "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the … claim is and the grounds upon which it rests.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Moreover, the complaint must "contain[ ] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).

A complaint is subject to dismissal for failure to state a claim if the allegations, taken as true, show the plaintiff is not entitled to relief, such as "when an affirmative defense … appears on its face." *Jones v. Bock*, 549 U.S.

199, 215 (2007) (quotation marks omitted). A claim has "facial plausibility" when the nonmoving party pleads facts that "allow[ ] the court to draw the reasonable inference that the [moving party] is liable for the misconduct alleged." *Id*. at 678. However, a claim does not have "facial plausibility" when the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Id*. at 679. The factual allegations "must do more than create speculation or suspicion of a legally cognizable cause of action; they must show entitlement to relief." *League of United Latin Am. Citizens*, 500 F.3d at 527. Showing entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).

In evaluating the allegations in the complaint, the court must be mindful of its limited task when presented with a motion to dismiss under Rule 12(b)(6). At the motion-to-dismiss stage, the court does not consider whether the factual allegations are probably true; instead a court must accept the factual allegations as true, even when skeptical. *See Twombly*, 550 U.S. at 555 (a court must proceed "on the assumption that all the allegations in the complaint are true (even if doubtful in fact)"); *id*. at 556 ("[A] well-pleaded

complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable"); *see also Neitzke v. Williams*, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations"). Indeed, in assessing the sufficiency of a complaint, the court must determine only whether "'the claimant is entitled to offer evidence to support the claims,' not whether the plaintiff can ultimately prove the facts alleged." *See United States v. SouthEast Eye Specialists, PLLC*, 570 F. Supp. 3d 561, 574 (M.D. Tenn. 2021) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002)).

B. Employee-Employer Relationship

Defendants first argue that Plaintiff was never an employee of LuxArk. Rather, they argue that she "functioned solely as an outsourced individual performing project-based tasks at LuxArk's request." (ECF No. 13, PageID.91). Defendants maintain that Plaintiff fails to allege in the Amended Complaint that she was an employee as defined by ELCRA. There are two primary problems with Defendants' argument. First, Plaintiff does plead that she was an employee of Defendants. *See* ECF No. 12, ¶ 4 ("At all times pertinent hereto, Charbonneau was employed by Defendants."). Defendants do not cite any case law suggesting that Plaintiff must allege more than that in a

complaint. Instead, Defendants cite *Ashker ex rel. Est. of Ashker v. Ford Motor Co.*, 245 Mich. App. 9 (2001), which addressed whether the economic reality test or the control test applied in determining whether the defendant was the plaintiff's employer in the context of a motion for summary judgment. Nothing in *Ashker* suggests that a plaintiff must plead in the complaint that it satisfies the economic reality test or the control test in order to sufficiently allege the existence of an employee-employer relationship.

Additionally, "Defendants' premise—that 'ELCRA only applies to employees'—is mistaken." *Jamoua v. Michigan Farm Bureau*, No. 20-CV-10206, 2021 WL 5177472, at *12 (E.D. Mich. Nov. 8, 2021). As explained in *Jamoua*:

> In *McClements v. Ford Motor Company*, Ford hired AVI Food Systems to operate cafeterias at one of its assembly plants. 473 Mich. 373, 702 N.W.2d 166, 168 (Mich. 2005). AVI, in turn, hired Milissa McClements to work at one the cafeterias. *Id*. McClements was sexually harassed by a Ford employee. *Id*. at 168–169. McClements sued Ford under ELCRA for failing to prevent the sexual harassment. *Id*. at 169. The Michigan Supreme Court held that if Ford "affected or controlled a term, condition, or privilege of [McClements'] employment," she could pursue an ELCRA claim against Ford. *Id*. at 173. In other words, ELCRA liability was not limited to McClements' employer but extended to any employer that affected or controlled a term of her employment. *See id*.

*Jamoua*, 2021 WL 5177472, at *12. Here, the Amended Complaint sufficiently alleges that Defendants affected or controlled terms of her employment where it is alleged that LuxArk's owner, Boone, promoted Plaintiff, controlled her work assignments, directed her daily activities, and paid her wages and bonuses. (ECF No. 12, ¶¶ 14, 16, 17). Thus, even if Plaintiff is not an "employee" of LuxArk, the allegations in the Amended Complaint show that Defendants affected or controlled terms of her employment.

C. Hostile Work Environment

The ELCRA is remedial and thus must be "liberally construed to suppress the evil and advance the remedy." *Eide v. Kelsey–Hayes Co.*, 431 Mich. 26, 34 (1988). One of the purposes of the ELCRA, specifically Mich. Comp. Laws § 37.2202, is to eradicate particular forms of discrimination in the workplace. *Elezovic v. Bennett*, 274 Mich. App. 1, 6 (2007) (citing *Champion v. Nationwide Security, Inc.*, 450 Mich. 702, 713 (1996)). "MCL 37.2202 forbids *any* employer from engaging in acts of discrimination that are prohibited by the [EL]CRA." *McClements v. Ford Motor Co.*, 473 Mich. 373, 386 amended 474 Mich. 1201 (2005) (emphasis in original). One form of discrimination the ELCRA prohibits is discrimination based on sex. *Elezovic*,

274 Mich. App. at 6 (citing Mich. Comp. Laws § 37.2202(1)). Thus, an employer shall not discriminate on the basis of sex, which includes sexual harassment. *Id*. (citing Mich. Comp. Laws §§ 37.2202(1)(a), 37.2103(i)).

There are two categories of sexual harassment: (1) quid pro quo and (2) hostile work environment. *Id*. (citing *Chambers v. Trettco, Inc*., 463 Mich. 297, 310-311 (2000)). Hostile work environment sexual harassment is defined to include

> unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature under the following conditions:
>
> * * *
>
> (iii) The conduct or communication has the purpose or effect of substantially interfering with an individual's employment ... or creating an intimidating, hostile, or offensive employment ... environment.

Mich. Comp. Laws § 37.2103(i).

Defendants argue that Plaintiff's hostile work environment claim fails because the Amended Complaint contains no allegations that she reported Boone's harassment to LuxArk or that the company failed to take corrective action after receiving notice. Defendants maintain that the absence of these allegations is fatal to Plaintiff's hostile work environment claim. Not so. When

the hostile work environment is created by the actions of *co-workers and other co-employees*, the alleged victim seeking a remedy under the ELCRA must file a claim of hostile work environment sexual harassment against her employer on a vicarious liability theory. *Elezovic*, 274 Mich. App at *7 (citing *Gilbert v. DaimlerChrysler Corp.*, 470 Mich. 749, 791-792 (2004)). Thus, to establish a prima facie case of hostile work environment sexual harassment, the plaintiff employee must prove (1) that she belonged to a protected group; (2) that she was subjected to communication or conduct on the basis of sex; (3) that she was subjected to unwelcome sexual conduct or communication; (4) that the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with her employment or created an intimidating, hostile, or offensive work environment; and (5) respondeat superior. *Radtke v. Everett*, 442 Mich. 368, 382-383 (1993). Respondeat superior liability exists when an employer has adequate notice of the harassment and fails to take appropriate corrective action. *Chambers*, 463 Mich. at 318-319.

However, "if an *employer* is accused of sexual harassment, then the respondeat superior inquiry is unnecessary because holding an employer liable for personal actions is not unfair." *Radtke*, at 397 (emphasis in original).

"Thus, when the hostile work environment is created by the actions of the employer, the alleged victim seeking a remedy under the [EL]CRA may file such a claim against her employer premised on a direct theory of liability." *Elezovic*, 274 Mich. App. at 7. In *Radtke*, the alleged perpetrator of the hostile work environment was the co-owner of the plaintiff's corporate employer and the court found that both the co-owner and the corporate employer could be liable for the sexual harassment. Notably, *Radtke* also pointed out that because perpetrator of the alleged conduct was the employer, recourse to the employer was fruitless, even where another co-owner was in the picture. *Id*. at 395. As explained above, the allegations in the Amended Complaint are sufficient to show to that LuxArk and Boone were Plaintiff's employers and that Boone, as the owner, is not merely a co-worker or co-employee. Thus, Plaintiff's hostile work environment claim does not fail because the Amended Complaint contains no allegations that she reported Boone's harassment to LuxArk or that the company failed to take corrective action after receiving notice.

Defendants also argue that Plaintiff's hostile work environment claim is "conclusory" in that Plaintiff has not pleaded facts showing that the conduct was sufficiently "severe or pervasive" to alter the conditions of employment.

The court first rejects this argument because it is woefully undeveloped and does not engage with the facts describing the alleged harassment in the Amended Complaint. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to...put flesh on its bones.").

Second, the court finds that Plaintiff's factual allegations regarding Boone's conduct, viewed in the light most favorable to Plaintiff and drawing all inferences in her favor, plausibly allege conduct that is sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment. *Bruce v. Adams & Reese, LLP*, 168 F.4th 367, 378 (6th Cir. 2026). The Amended Complaint recounts that over the course of two months, Plaintiff was subjected to frequent sexualized messages and even threatening sexual messages from Boone. Similar to the facts in *Bruce*, it is plausible that a young female employee would be intimidated and that her performance would be affected by persistent sexual and threatening messages from her supervisor. *Id*. at 378. And this is not a situation with "occasional … offensive utterances" that are not "physically threatening or

humiliating," which do not render a work environment hostile and discriminatory. *Grace v. USCAR*, 521 F.3d 655, 679 (6th Cir. 2008) (citation omitted). Instead, the comments were persistent and ongoing and continued even after Plaintiff submitted her resignation. Because the well-pleaded facts demonstrate a pattern of sexualized comments by a supervisor, Plaintiff has plausibly alleged a hostile work environment sexual harassment claim. *See Bruce*, 168 F.4th at 380.

D. *Quid Pro Quo* Sexual Harassment

Defendants argue that while Plaintiff claims she was subject to sexual harassment by Boone, she fails to allege any "actions" by LuxArk that constitute a violation of § 37.2103(k)(i)-(ii). Mich. Comp. Laws § 37.2103(k)(i)-(ii), commonly referred to as the quid pro quo provision of the ELCRA, provides as follows:

> (k) Discrimination because of sex includes sexual harassment. Sexual harassment means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature under the following conditions:
>
> > (i) Submission to the conduct or communication is made a term or condition either explicitly or implicitly to obtain employment, public accommodations or public services, education, or housing.

> (ii) Submission to or rejection of the conduct or communication by an individual is used as a factor in decisions affecting the individual's employment, public accommodations or public services, education, or housing.

Mich. Comp. Laws § 37.2103(k). A claim of quid pro quo sexual harassment under the ELCRA requires that the plaintiff demonstrate that she was (1) subjected to unwelcome sexual conduct or communication described in the statute, and (2) her employer or the employer's agent used her submission to or rejection of the conduct as a factor in a decision affecting her employment. *Chambers*, 463 Mich. at 310. "The statute expressly addresses an employer's vicarious liability for sexual harassment committed by its employees by defining 'employer' to include both the employer and the employer's agents." *Id*. (citing Mich. Comp. Laws § 37.2201(a)). As Defendants acknowledge, an employer is strictly liable under the ELCRA for quid pro quo sexual harassment. *Id*. at 313; *see also* ECF No. 13, PageID.96. Accordingly, it does not matter whether Plaintiff's Amended Complaint sufficiently alleged the vicarious liability of LuxArk for Boone's actions.

Next, Defendants argue that LuxArk cannot be held liable for the alleged sexual misconduct committed by Boone because such misconduct is, as a

matter of law, outside the scope of an employee's employment. *See Hamed v. Wayne County*, 490 Mich. 1, 11 (2011). The court first rejects this argument because it is woefully undeveloped. *McPherson*, 125 F.3d at 995-96 ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to...put flesh on its bones.").

Second, the facts and holding of *Hamed* do not appear applicable to the present circumstances. In *Hamed*, the court decided the issue of whether the county and sheriff's department may be held vicariously liable for quid pro quo sexual harassment based on a criminal act of a deputy sheriff committed during working hours. The court held an employer's liability for the criminal acts of its employees is limited to those acts it can reasonably foresee or reasonably should have foreseen. *Id*. at 13. Here, Plaintiff does not allege the Boone engaged in any criminal conduct, such as the sexual assault at issue in *Hamed*. Thus, this case is inapplicable.

E. Retaliation

Defendants argue that Plaintiff's Amended Complaint does not allege a prima facie case of retaliation. As the Sixth Circuit has acknowledged, "the

Supreme Court [has] unanimously held that the prima facie case under *McDonnell Douglas* is an evidentiary standard, not a pleading requirement [and that] … it is not appropriate to require a plaintiff to plead facts establishing a prima facie case….” *Keys v. Humana, Inc.*, 684 F.3d 605, 609 (6th Cir. 2012) (quoting *Swierkiewicz*, 534 U.S. at 511). Rather, a complaint need only “allege sufficient ‘factual content’ from which a court, informed by its ‘judicial experience and common sense,’ could ‘draw the reasonable inference,’” that Defendant engaged in conduct that violates Title VII. *Keys*, 684 F.3d at 610 (quoting *Iqbal*, 556 U.S. at 678, 679). Defendant’s entire argument for dismissal rests on their claim that Plaintiff failed to plead a prima facie case. Since such an evidentiary standard may not be imposed on Plaintiff at this stage of the proceedings, the motion to dismiss the retaliation claim must be denied.

F. Constructive Discharge

Although constructive discharge is often raised as a separate count in actions involving employment disputes, it is not a separate cause of action in and of itself. *Cooper v. Bader & Sons Co.*, 2018 WL 2449129, at *2 (Mich. Ct. App. May 31, 2018) (citing *Vagts v. Perry Drugs Stores, Inc.*, 204 Mich. App. 481, 487 (1994)). “Thus, an underlying cause of action is needed where it is

asserted that a plaintiff did not voluntarily resign but was instead constructively discharged." *Vagts*, 204 Mich. App. at 487. A constructive discharge occurs only "when the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Selph v. Gottlieb's Fin. Servs., Inc.*, 35 F. Supp. 2d 564, 567-68 (W.D. Mich. 1999) (quoting *LeGalley v. Bronson Community Schools*, 127 Mich. App. 482, 486 (1983)). Stated another way, "[c]onstructive discharge is found 'in situations in which working conditions were so difficult or unpleasant that a reasonable person in the employee's shoes would have been compelled to resign.'" *Backer v. Wyeth–Ayerst Laboratories*, 949 F. Supp. 512, 518-519 (W.D.Mich.1996) (quoting *Storch v. Beacon Hotel Corp.*, 788 F. Supp. 960, 965 (E.D.Mich.1992)).

Defendants argue that Plaintiff cannot plausibly meet this standard because she has not alleged facts showing that LuxArk made her working conditions intolerable. Where a constructive discharge claim is based on the same facts as the hostile work environment claim, dismissal is precluded for same reasons. *See e.g.*, *Ojemudia v. Rite Aid Servs., L.L.C.*, 540 F. Supp. 2d 855, 869 (E.D. Mich. 2008) (where summary judgment denied on hostile work

environment claim and constructive discharge claim is based on the same facts, summary judgment for constructive discharge is also precluded).

G. Extraterritorial Reach of the ELCRA

In the reply brief, Defendants argue that Plaintiff's ELCRA claims must be dismissed because the statute does not apply extraterritorially to individuals located outside the United States who are not authorized to work within its borders.[1] The court ordered supplemental briefing on this issue, and both parties submitted briefs. ECF No. 22, 23. As explained fully below, Defendants have not presented any arguments that convince the court ELCRA should not apply.

In support of their argument, Defendants cite *EEOC v. Arabian American Oil Co*., 499 U.S. 244 (1991) ("*ARAMCO*"). In *ARAMCO*, the United States Supreme Court held that Title VII does not apply extraterritorially to regulate the employment practices of U.S. employers employing U.S. citizens abroad. The Court reasoned that, absent clear and affirmative congressional

[1] Defendants also assert, on information and belief, that Plaintiff was never authorized to work in the United States as an employee or possessed valid employment authorization from the United States government or the Immigration and Naturalization Service. These allegations are not contained in the Amended Complaint and cannot be considered here, where the court is limited to the allegations contained therein. Given the absence of evidence in the record on this issue, it is best left to a properly supported motion for summary judgment.

intent to extend the statute's reach overseas, federal civil rights laws apply only domestically. *Id*. at 248-49. Defendants argue that Michigan's ELCRA, patterned in part after Title VII, contains no language indicating any intent by the Michigan Legislature to extend its reach beyond the State's borders or to nonresidents performing work outside its jurisdiction. Finally, they argue that because courts have consistently found that 42 U.S.C. § 1981 and § 1983 do not apply extraterritorially, ELCRA must not apply to Plaintiff here.

First, Defendants' reliance on *ARAMCO* is largely misplaced. *ARAMCO* applied to U.S. employers employing U.S. citizens abroad, and it was legislatively overturned by Congress. *See Conerly v. CVN Companies, Inc.*, 785 F. Supp. 801, 805 n.6 (D. Minn. 1992) ("Section 109 legislatively overturns the Supreme Court's determination in [*ARAMCO*] that Title VII does not apply 'extraterritorially to regulate the employment practices of United States employers who employ United States citizens abroad.'"), *aff'd*, 34 F.3d 1070 (8th Cir. 1994). Although it is true that there is a general presumption against the extraterritorial application of both state law, *see generally Sexton v. Ryder Truck Rental, Inc.*, 320 N.W.2d 843, 855 (Mich. 1982), and federal law,

> the presumption against extraterritoriality is not applicable when the conduct regulated by the government occurs within the United States. By definition, an extraterritorial application of a

> statute involves the regulation of conduct beyond U.S. borders. Even where the significant effects of the regulated conduct are felt outside U.S. borders, the statute itself does not present a problem of extraterritoriality, so long as the conduct which Congress seeks to regulate occurs largely within the United States.

*Env't Def. Fund, Inc. v. Massey*, 986 F.2d 528, 531 (D.C. Cir. 1993); *see also Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 417 (2023) ("We have repeatedly explained that this principle, which we call the presumption against extraterritoriality, refers to a presumption against application to conduct in the territory of another sovereign. … Thus, if the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application of the statute…" (citations omitted)). If the ELCRA was applied here, Michigan law would not be attempting to control the conduct of a person that occurred outside of its borders; LuxArk is a Michigan-based employer, and Boone's alleged actions came from within the state. *See also Kambala v. Checchi & Co. Consulting, Inc.*, 280 F. Supp. 3d 131, 139 (D.D.C. 2017) (finding that the District of Columbia Human Rights Act (DCHRA) applied to plaintiff, a citizen of Congo who worked for a U.S. company in Mali, because the decision to terminate plaintiff came from the employer's headquarters in D.C. and it was therefore not an extraterritorial

application of the statute, and because the DCHRA does not specifically exclude non-U.S. citizens as Title VII does).

It is also true that Title VII contains specific language stating that it is not applicable "to the employment of aliens outside any State…." 42 U.S.C. § 2000e–1(a). But this language is absent from ELCRA, and interpretation of ELCRA with relation to Title VII is only appropriate insofar as the statutes are substantially similar. *Miller v. Michigan Dep't of Corr.*, 996 N.W.2d 738, 743 (Mich. Ct. App. 2022) ("[F]ederal decisions interpreting Title VII are not blindly applied to the counterpart sections of [ELCRA]. Instead, *only* if the controlling language in Title VII is substantially similar to that contained in the Act can we look to federal caselaw for potential guidance."), *rev'd on other grounds sub nom. Miller v. Dep't of Corr.* 15 N.W.3d 129 (Mich. 2024). Therefore, comparison to Title VII provides little reason to find the ELCRA inapplicable. Defendants' comparisons to §§ 1981 and 1983 are similarly unconvincing.

Finally, Defendants also have not argued that any foreign state has a greater interest in seeing its laws applied. In *Wang v. General Motors*, 371 F. Supp. 3d 407 (2019), the plaintiff brought a claim under ELCRA related to his involuntary retirement, which occurred while he worked in China. *Id*. at 412. The defendant argued, based on *Ausel v. Unisys Corporation*, 1997 WL 720427

(6th Cir. Nov. 13,1997), an unpublished Sixth Circuit decision, that ELCRA did not apply extraterritorially. *Id*. at 418. In *Ausel*, the court, relying on *Severine v. Ford Aerospace and Communications Corp*., 118 Mich. App. 769 (1982), concluded that ELCRA did not apply to the defendant's decision to replace the plaintiff with a younger female employee and move him from a position in New Jersey to a position in Pennsylvania. This was so because Michigan followed the doctrine of *lex loci delicti*, which required that a defendant reside or conduct business in Michigan and that the harmful effect of the challenged conduct occur in Michigan, and the plaintiff experienced no harm effect in Michigan resulting from the defendant's employment action. *Ausel*, at *1-2. The rule of *lex loci delicti* means that the locus of the tortious act determines the rules of decision for the court. *Wang*, 371 F. Supp. 3d at 418. However, as the *Wang* decision points out, the Michigan Supreme Court has since held that it no longer follows this approach and instead applies a modified law-of-the-forum approach:

> [W]e will apply Michigan law unless a "rational reason" to do otherwise exists. In determining whether a rational reason to displace Michigan law exists, we undertake a two-step analysis. First, we must determine if any foreign state has an interest in having its law applied. If no state has such an interest, the presumption that Michigan law will apply

> cannot be overcome. If a foreign state does have an interest in having its law applied, we must then determine if Michigan's interests mandate that Michigan law be applied, despite the foreign interests.

*Sutherland v. Kennington Truck Service, Ltd.*, 454 Mich. 274, 286 (1997). In *Wang*, the court applied *Sutherland's* law-of-the-forum rule and concluded that Michigan law governed because no other state had an overriding interest in having its law apply, and the plaintiff claimed that GM, from its Michigan headquarters, refused to hire or transfer him to a position in the United States after the termination of his job in China. *Id*. at 418. Thus, the court held, there was no reason not to apply Michigan law. *Id*.

Similarly, here, Plaintiff alleges that the harassment came from Michigan and Defendants do not argue that any other state has a greater interest in seeing its laws applied, while Michigan certainly has an interest in preventing its own employers, acting from within its borders, from engaging in harassment. For these reasons, the court sees no reason not to apply Michigan law. *See Foster v. Federal Express Corp.*, 2005 WL 3369484, *3 (E.D. Mich. Dec. 12, 2005) (applying ELCRA to the plaintiff's employment tort claim even though he was terminated while working in the state of Washington, where the defendant had national operations, including ongoing operations in

Michigan, Washington did not have an overriding interest in having its law apply, and both states had enacted legislation prohibiting racial discrimination).

## IV. CONCLUSION

For the reasons set forth above, the motion to dismiss is **DENIED**.

**SO ORDERED**.

Date: September 29, 2026

s/F. Kay Behm
F. Kay Behm
United States District Judge